**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALEXIS WENG,

      Plaintiff,

                                       Case No.: 05-71404

vs.                                      Hon. Lawrence Zatkoff

DCI MARKETING,

      Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on November 30, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment (Docket #18).

Plaintiff has filed a response, and Defendant has filed a reply brief.  The Court finds that the facts

and legal arguments pertinent to Defendant's Motion are adequately presented in the parties' papers,

and the decisional process will not be aided by oral arguments.  Therefore, pursuant to E.D. Mich.

Local R. 7.1(e)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted,

without this Court entertaining oral arguments.  For the reasons that follow, Defendant's Motion for

Summary Judgment is GRANTED IN PART and DENIED IN PART.

## II.  BACKGROUND

Plaintiff Alexis Weng ("Plaintiff") began working for Defendant DCI Marketing ("Defendant") on June 13, 2000, when Anita Barnes ("Barnes") "caused [Plaintiff] to be hired by" Defendant. Defendant employed Plaintiff as a video producer in its automotive kiosk video division, where employees created interactive videos for consumers to view at GM dealer showrooms. At the time Plaintiff was hired, she had just married Matthew Weng, an equity partner in Shadowbox Newmedia Group ("Shawdowbox"), a vendor to Defendant. Barnes, Plaintiff's direct supervisor, and many other employees at Defendant knew of the relationship between Plaintiff and Matthew Weng. Throughout her tenure at Defendant, Plaintiff's reviews were consistently positive. She was reviewed on an annual basis, including in June 2001, 2002, 2003 and 2004. The reviews were based upon comments and assessments of Plaintiff's performance by Barnes, other staff and co-workers that regularly interacted with Plaintiff. It is undisputed that Plaintiff was extremely well-liked at Defendant.

Plaintiff had two children while working for Defendant. She had her first child in 2001 and her second child in 2003. Beginning with Plaintiff's second pregnancy, Barnes allegedly commented routinely about her unhappiness with Plaintiff's pregnancies, and specific comments such as, "oh, I can't live with you pregnant again" were made on more than one occasion. These statements allegedly were made often during Plaintiff's second pregnancy. Plaintiff did not file a formal complaint at that time. Plaintiff had her second child on March 31, 2003.

In approximately April 2004, Defendant decided to single source certain kiosk video production work that was previously done by at least three other companies: Shadowbox, Kinetic Post Productions ("Kinetic") and Oracle. Notwithstanding these prior relationships, Defendant elected to use Grace & Wild to perform the work, and Barnes confided to Plaintiff and another of

Defendant's employees that the Grace & Wild work would be done for $17,000. Shortly thereafter, Shadowbox, Kinetic and Oracle submitted a joint bid to act as a single source vendor. Maryellen Clinton signed the proposal letter to Defendant in her capacity as the President of Shadowbox. The proposal by the three companies matched the $17,000.00 per unit price proposed by Grace & Wild.

At some point, Defendant concluded that there was a price leak from within the Defendant to the persons at Shadowbox, Kinetic or Oracle. Defendant did not, however, conduct any investigation into the alleged pricing leak at that time. No one from Defendant called Shadowbox, Oracle or Kinetic in order to inquire as to how they came about their per unit quote price. No actions were taken to discipline Plaintiff, the person Barnes accused of being the leak. Plaintiff was not denied access to computer systems, did not have her password evoked, was not suspended from her job, was not removed from working with specific clients and customers and was in no way disciplined. And, when Plaintiff was reviewed in June 2004, there was no mention of the alleged price leak by Plaintiff. Plaintiff's overall performance was listed as good and she received a raise of approximately 3.5%, the same raise she had received in 2003.

During early 2004, Plaintiff was considering having a third child. In approximately May 2004, Barnes allegedly made another comment regarding her distaste for another Plaintiff pregnancy. When the potential third pregnancy was discussed, Barnes' tone allegedly became more hostile. In May 2004, Plaintiff told her co-workers that she was pregnant with her third child. Barnes allegedly made comments about Plaintiff's pregnancy, to the effect that, "oh, no, you're pregnant, we've got to live with you pregnant again, I don't know if I can do that again." On July 17, 2004, at a company picnic attended by various upper level Defendant employees from Milwaukee, Wisconsin, Plaintiff announced that she was pregnant with her third child.

Approximately two weeks later, on or about July 29, 2004, Plaintiff was working with two Grace & Wild editors on a GM project at Defendant's facility. When Barnes was leaving the facility that day, she knocked on a door and entered to find Plaintiff and the two editors looking at a cartoon image on the computer screen. The cartoon image on the screen was that of a vintage convertible Porsche that Plaintiff's husband, Matthew Weng, had created.  By that time, Shadowbox was no longer a vendor of Defendant.

The alleged conflict of interest offense was relayed to the Human Resources department for the Defendant.  Eventually, Barnes spoke with her superiors, and a decision to terminate Plaintiff was made. Pursuant to a correspondence dated August 18, 2004, approximately 20 days after the revelation of the cartoon image, Plaintiff was terminated.   The August 18, 2004, correspondence is signed by Barnes.   Defendant agrees that Barnes provided all of the information contained in the document and that Barnes agreed with each and every statement in the document.  Defendant also states, however, that Joyce Campopiano, Defendant's Director of Human Resources (located in Milwaukee, Wisconsin), prepared the termination letter and was the decision maker with respect to Plaintiff.

In June 2005, GM decided not to renew the kiosk contract with Defendant. Defendant downsized from approximately 25 employees to 21 or 22 employees at its Troy, Michigan office and eliminated the kiosk video division.  Defendant's Troy office continues to do work for the automobile industry.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).  In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.  The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts.  It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

5

# IV.  ANALYSIS

## A.     Conceded Claims

In her response brief, Plaintiff concedes that Defendant's Motion should be granted as it relates to Plaintiff's race discrimination claim and the intentional infliction of emotional distress claim.  Accordingly, the Court hereby GRANTS Defendant's Motion with respect to Plaintiff's claims of race discrimination and intentional infliction of emotional distress.

## B.     Pregnancy Discrimination Claim

The Pregnancy Discrimination Act, 42 U.S.C. § 2000e (the "PDA"), provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not  so affected but similar in their ability or inability to work…

There are three ways to demonstrate pregnancy discrimination under the PDA: (1) by presenting direct evidence of discrimination; (2) by showing statistical evidence of disparate treatment or impact; and (3) by establishing an indirect case of discrimination under *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973); *Raciti-Hur v. Homan*, 1999 U.S. App. LEXIS 9551, at *7, No. 98-1218 (6th Cir. 1999); *Fannon v. AAP St. Marys Corp*., 1997 U.S. App. LEXIS 23776, at *5-*6, No. 96-3506 (6th Cir. 1997).  Plaintiff contends that there is both direct evidence of pregnancy discrimination and circumstantial (indirect) evidence of discrimination in this case.

### 1.     Direct Evidence

Under the PDA, direct evidence of pregnancy discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-lough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926

6

(6th Cir. 1999); *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998) (direct evidence in a disability case will be similar to an employer stating that "I fired you because you are disabled"). If the plaintiff establishes such direct evidence, the burden shifts to the employer to show that it would have taken the adverse employment action even if it had not been motivated by discrimination. *Jacklyn*, 176 F.3d at 926; *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)).

In this case, the Court cannot find that there was direct evidence that Defendant terminated Plaintiff by unlawfully discriminating against her. There are no statements that, if believed, would require the Court to conclude that Plaintiff was fired because she was pregnant, or even that she might be fired if she became pregnant.

### 2.      Circumstantial (Indirect) Evidence

The Court agrees with Plaintiff that proffered circumstantial or indirect evidence supports her claim of pregnancy discrimination.

#### a.      *Prima Facie Case*

In order to establish a prima facie case of pregnancy discrimination involving circumstantial evidence, Plaintiff must show that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment action, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline v Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000). There is no dispute as to the first three criteria. Plaintiff was pregnant. She was qualified for her job, as her consistently good performance reviews demonstrate. Finally, she was subjected to an adverse employment action (*i.e.*, termination).

The Court also finds that there is sufficient evidence of a nexus between Plaintiff's

pregnancy and the adverse employment decision to withstand Defendant's Motion for Summary Judgment.  There is evidence in the record that Barnes continuously and repeatedly made comments about her dislike for Plaintiff's pregnancies, commencing with Plaintiff's second pregnancy and continuing up to as late as May or June, 2004, when Plaintiff was considering a third pregnancy (and perhaps even after certain employees Defendant learned Plaintiff was pregnant again).  These comments were made on numerous occasions and were not stray isolated remarks.  *See Sniecinski v Blue Cross & Blue Shield*, 469 Mich. 124, 136 (2003), wherein the Michigan Supreme Court listed the following factors to consider in assessing whether statements are "stray remarks," including whether they were (1) made by a decision maker or an agent within the scope of her employment, (2) related to the decision making process, (3) vague and ambiguous or clearly reflective of discriminatory bias, (4) isolated or part of a pattern of biased comments, and (5) made close in time to the adverse employment decision.

In this case, Barnes allegedly made numerous comments that she couldn't live with Plaintiff being pregnant.  There is evidence that Barnes was instrumental in the hiring and firing of Plaintiff, and that Barnes generally controlled Plaintiff's work (there is no dispute that she performed Plaintiff's reviews and dictated what work Plaintiff was assigned and Defendant itself stated that Barnes "caused [Plaintiff] to be hired by" Defendant).  The fact that Barnes signed the August 18, 2004, letter terminating Plaintiff constitutes evidence that she was the person who terminated Plaintiff.  In addition, the comments Barnes made were part of a pattern, all of which can be considered related to the decision making process. The comments made by Barnes were not vague or ambiguous. Specifically, the comments made applied to Plaintiff and her past and impending pregnancies. Barnes repeatedly stated that she could not live with Plaintiff while she was pregnant.

Finally, the comments were made close in time to the adverse employment decision (including just shortly before (and/or after) Plaintiff announced she was pregnant for the third time). Then, a short time after Barnes learned of Plaintiff's third pregnancy, Plaintiff was terminated via a letter signed by Barnes.  The timing of Plaintiff's termination, in conjunction with the comments by Barnes about not being able to live with Plaintiff being pregnant, constitute sufficient circumstantial evidence to establish a prima facie case. *See Cline*, 206 F.3d at 660 ("The prima facie case is not meant to be an onerous burden, and the amount of evidence that a plaintiff must produce on the elements is not great").  Accordingly, the Court finds Plaintiff has met her burden here.

### b.    *Defendant's Legitimate Business Reasons*

Once Plaintiff meets her prima facie burden under the discrimination theory, an inference of discrimination is established. Defendant may rebut the inference by demonstrating its actions were based upon "legitimate business reasons."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  In this case, the Court finds that Defendant has satisfied its burden by offering evidence that Plaintiff's termination was the result of the alleged breaches of confidentiality in April 2004 (the price leak) and in late July 2004 (Plaintiff's meeting with Grace & Wild employees).

### c.    *Mere Pretext*

Upon Defendant's demonstration of legitimate business reasons, Plaintiff may then show that the reasons Defendant proffered are merely pretext for discrimination. A plaintiff can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).

Plaintiff has presented evidence to demonstrate that the two acts complained of were not the

actual motivation for Plaintiff's termination.   The actions (or inaction) of Defendant immediately after each incident create a genuine issue of material fact as to the significance of the incidents.  As to the first incident, Defendant admits that it had no evidence that Plaintiff was the source of the price leak in April 2004.  Defendant conducted absolutely no investigation of Plaintiff, and no one from Defendant contacted Shadowbox, Oracle, or Kinetic about the bid.  In addition, no one at Defendant's Troy office contacted the central Human Resources department in Milwaukee, Wisconsin.  Moreover, Plaintiff was not disciplined in any fashion and, two months after the alleged terminable event, Barnes gave her favorable reviews and a 3.5% raise.

The Defendant's second proffered business reason for Plaintiff's dismissal also is subject to question.  Barnes admitted that Plaintiff's meeting with the Grace & Wild editors was authorized.  Plaintiff claims that she was conducting business (according to Plaintiff, they were awaiting an email for business) when the cartoon image was shown.  Moreover, at the time the cartoon was shown, Plaintiff has testified that she had no idea that Barnes was considering using animation in the GM kiosks.   Despite the concerns that Plaintiff's conduct was improper, however, Defendant did not revoke Plaintiff's password or computer privileges, Defendant did not instruct Plaintiff to stay away from certain clients, Plaintiff did not have her email restricted, and she was not suspended.  Further, no contact was made with any of the employees at Grace & Wild.

For the foregoing reasons, the Court concludes Plaintiff has offered sufficient evidence to demonstrate that the proffered business reasons were pretext for pregnancy discrimination.

> ### d.   Conclusion

For the reasons stated, Defendant's Motion is granted with respect to Plaintiff's race discrimination and intentional infliction of emotional harm and denied with respect to Plaintiff's

pregnancy discrimination claim.

**C.    Limitation of Damages**

Defendant maintains that it should be granted partial summary judgment on the issue of any economic damages allegedly incurred subsequent to June 9, 2005, when Defendant (1) lost its GM kiosk video business, (2) permanently laid off all employees working in th kiosk video division, and (3) did not offer transfer or rehire to any of the affected employees.  Where the employer claims to have eliminated an employee's position pursuant to a reduction in force or a reorganization, the employee establishes a prima facie case of discrimination when he or she shows (a) that she was of the protected class; (b) that she was qualified for the position; (c) adverse employment action; and (d) "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff…for impermissible reasons." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990).

As discussed above, the first three elements are not in dispute.  In addition, as discussed above, there is sufficient evidence of pregnancy discrimination such that Plaintiff has survived Defendant's motion for summary judgment.  Such evidence supports a finding that there remains an issue of material fact whether Defendant singled out Plaintiff for impermissible reasons.  With this evidence of discriminatory treatment, Plaintiff meets her prima facie case, even if heightened scrutiny of a work-force reduction is implied.  *McMahon v Libbey Owens-Ford Co.*, 870 F.2d 1073, 1077 (6th Cir. 1989).

Moreover, although Defendant's position is tenable, there is also evidence that Plaintiff would not necessarily have lost her job on a particular day.  For example, even without the GM kiosk business, employees in Plaintiff's department stayed with the company until other projects

11

were wrapped up.  In addition, Barnes admitted that Plaintiff was well-liked not only by her own team members, but by members of other departments at Defendant. When asked if Plaintiff could have transferred to another department in Defendant after the GM account was lost, Barnes answered, "if somebody else wanted her, sure."

For the foregoing reasons, the Court concludes that there remains a genuine issue of material fact as to whether, and for how long, Plaintiff's employment would have continued beyond June 2005, if not for her termination in August 2004.  Accordingly, Defendant's request for partial summary judgment on economic damages is denied.

## V.  CONCLUSION

Accordingly, and for the reasons above, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  November 30, 2006

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on November 30, 2006.

s/Marie E. Verlinde
Case Manager
(810) 984-3290

12